## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

GUANTANAMERA CIGAR CO.,      )
                                           )

            **Plaintiff,**      )

               **v.**            )      **Civil Action No. 08-0721 (RCL)**

                                           )

CORPORACION HABANOS, S.A.,    )

                                         )

           **Defendant.**     )

_____)

### MEMORANDUM OPINION

This case comes before the Court on cross motions for summary judgment filed by plaintiff Guantanamera Cigar Company's ("GCC") and defendant Corporacion Habanos, S.A. ("Habanos"). Upon reviewing the motions, the Court concludes that the Trademark Trial and Appeal Board ("TTAB") erred as a matter of law in applying the three-part test for primarily geographically deceptively misdescriptive marks, which are barred from registration by the Lanham Act, 15 U.S.C. § 1052(e)(3) (2006). Therefore, the Court grants the plaintiff's motion for summary judgment.

### I.     FACTUAL BACKGROUND

*A. General Background*

GCC is a small company based in Coral Gables, Florida. (Notice of Opposition ("NO") at 1.) GCC manufactures cigars in Honduras from non-Cuban seeds, then sells and distributes them mainly in the Miami area, as well as other parts of the United States. (Montagne Dep. at 24:24–25; Pl.'s Statement of Material Fact at 9.) GCC filed a trademark application for the mark GUANTANAMERA for use in connection with cigars on May, 14, 2001. (NO at 1.) When

translated, "guantanamera" means "(i) the female adjective form of GUANTANAMO, meaning having to do with or belonging to the city or province of Guantanamo, Cuba; and/or (ii) a woman from the city or province of Guantanamo, Cuba." (Op. U.S.P.T.O. at 2.) Many people are also familiar with the Cuban folk song, Guantanamera, which was originally recorded in 1966. (*Id.* at 12–13.)

Habanos, jointly owned by the Cuban government and a Spanish entity, manufactures cigars. (*Id.* at 2.) The Cuban embargo prohibits Habanos from exporting cigars into the U.S. (*Id.* at 5.) Habanos, however, owns trademarks on many cigar brands outside the U.S., including registrations or applications for GUANTANAMERA in more than 100 countries in the world. (Def.'s Mot. Summ. J. at 4, n.2.) On December 29, 1998, Habanos applied for the mark in Cuba, and registered the mark on March 13, 2001. *Id.* Habanos applied for a U.S. Trademark on April 15, 2002, but its application remains suspended because of GCC's prior application. (*Id.* at 3–4.)

Shortly after the TTAB published GCC's application, Habanos filed an opposition, which asserted that GUANTANAMERA was primarily geographically deceptively misdescriptive, and therefore barred from registration. (*Id.* at 4.) The TTAB agreed and found that GUANTANAMERA was primarily geographically deceptively misdescriptive and that Habanos had standing to oppose registration. (Op. U.S.P.T.O. at 4–5, 21). GCC filed this appeal for a de novo review of the TTAB's Opinion dated February 29, 2008. (Compl. at 1) The parties cross-filed for summary judgment. (Compl. at 1; Pl.'s Mot. Summ. J.; Def.'s Mot. Summ. J. at 1.)

*B. Civil Contempt and Sanctions*

During discovery on August 18, 2009, this Court ordered the plaintiff to pay reasonable attorney's fees and costs totaling $18,054.79 to defendant's counsel for violating numerous discovery rules. (Mem. Op. at 5–9, Aug. 18, 2009.) The Court conditioned payment on approval

by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") and set the deadline for payment at thirty (30) days after the defendant filed notice of OFAC approval. (Order at 1, Dec. 10, 2009.) The defendant filed notice of OFAC's approval on March 1, 2010, giving the plaintiff until March 31, 2010 to tender payment. (Def.'s Notice at 1.) On March 31, defendant's counsel received a personal check from plaintiff's counsel in the amount of $5,000. (Def.'s Mot. at 5, April 9, 2010.) On the following day, plaintiff filed a "Motion for Enlargement of Time to Comply with the Court's December 10, 2009 Order, or Aletrnatively [sic] Relief from and Modification of the Order," which the plaintiff acknowledged was one day late due to a change of local counsel and an electronic filing issue. (Pl.'s Mot., April 1, 2010.) The motion proposed a payment plan consisting of four (4) equal monthly payments of $2,600 and a final payment of $2,654.79, which would pay off the remaining $13,054.79 balance. (*Id.* at 2.) After tailoring it's own custom payment plan, the plaintiff failed to make any monthly payments. (Def.'s Reply Mem. Supp. Mot. Civil Contempt at 2.)

### C. Expert Witness Costs

The defendant deposed expert Jorge Armenteros on December 16, 2009. (Pl.'s Mot. Compel Expert Fees at 2.) Armenteros traveled from his home in Hopewell, New Jersey to defendant's counsel's office in Lower Manhattan for the deposition. (D.'s Mem. Opp. Compel Expert Fees at 3.) Charging an hourly rate of $350/hour, Armenteros' billed defendant a total of $11,661.69. (Pl.'s Mot. Compel Expert Fees Ex. B.) The invoice includes over nineteen hours of document printing, one hour of deposition preparation and review, and eleven hours of deposition and travel. (*Id.*) The deposition lasted four hours and twelve minutes. (D.'s Mem. Opp. Compel Expert Fees at 3.) Expenses associated with the deposition trip totaled

approximately $76. (*See* Pl.'s Mot. Compel Expert Fees Ex. B.) Plaintiff filed a motion to compel payment of the entire invoice. (Pl.'s Mot. Compel Expert Fees.)

## II.  DISCUSSION

### A.  Legal Standard for Summary Judgment

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute. FED. R. CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute, by itself, is not enough to bar summary judgment. *Liberty Lobby,* 477 U.S. at 248. "Genuine" means that the issue must be supported by sufficiently admissible evidence so that a reasonable trier of fact could find for the nonmoving party; "material" means that the factual assertion must be capable of affecting the substantive outcome of the litigation. *Id.* at 248–49.

### B.  Standard of Review

The Court reviews the TTAB's findings of fact under the Administrative Procedure Act's ("APA") "substantial evidence" standard, which requires the Court to defer to the factual findings made by the TTAB unless new evidence "carries thorough conviction." *Material Supply Intern, Inc. v. Sunmatch Indus. Co.*, 146 F.3d 983, 990 (D.C. Cir. 1998).  The "substantial evidence" standard is considered less deferential than the "arbitrary, capricious" approach. *On-Line Careline Inc. v. America Online, Inc.*, 229 F.3d 1080, 1085–86 (Fed. Cir. 2000)). "Substantial evidence" is more than a mere scintilla. *Id.*

The TTAB's refusal to register a mark because it is primarily geographically deceptively misdescriptive is a finding of fact. *In re Wada*, 194 F.3d 1297, 1299 (Fed. Cir. 1999). Therefore, the Court reviews the TTAB's factual findings with the deferential "substantial evidence" standard and the TTAB's legal standards de novo. *Material Supply*, 146 F.3d at 990.

*C. Standing*

GCC argues that Habanos lacks standing to oppose registration of a U.S. trademark. The Court disagrees.

Generally, there must be a "case or controversy" between the two parties in order for the plaintiff to have standing. *Richie v. Simpson*, 170 F.3d 1092, 1094 (Fed. Cir. 1999). However, the standing requirements differ before an administrative agency like the TTAB. *Id.* Statute, rather than the "case or controversy" requirements, confers standing requirements before an agency. *Id.* at 1095. The Lanham Act provides:

> Any person who believes that he would be damaged by the registration of a mark upon the principal register, including the registration of any mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefore . . . .

15 U.S.C. § 1063. Though the Lanham Act's requirement's are broad, the opposer must meet two additional judicially-created requirements: he must have a "real interest" in the proceedings and a "reasonable basis" for his belief of damage. *Ritchie*, 170 F.3d at 1095.

Habanos satisfies both requirements. First, Habanos has a "real interest" in the proceedings. A "real interest" is a "direct and personal stake in the outcome of the opposition." *Id.* A Court held that an opposer had a real interest in the registration of O.J. Simpson's marks O.J. SIMPSON, O.J., and THE JUICE based on the opposer's status as "a family man" who believed the marks were threatening to family values. *Id.* at 1097. In *Richie*, the opposer had no financial interest in the registration, yet the Court found he had a "real interest." *Id.* Here, Habanos' interest is more direct than the opposer in *Richie*. Habanos has a pending application for U.S. trademark for the same mark, and it sells

cigars labeled with the same mark in other countries. Therefore, Habanos has a real interest in the outcome of the registration.

Second, Habanos has a reasonable basis for its belief of damage. The opposer must have a "reasonable basis in fact;" a subjective belief is insufficient. *Id.* at 1098 (quoting *Universal Oil Products, Co. v. Rexall Drug and Chemical Co.*, 463 F.2d 1122 (C.C.P.A. 1972)). Mr. Richie submitted petitions signed by people from all over the United States to establish his reasonable basis for his belief of damage. *Id.* In other words, the subjective beliefs of others qualified as "objective proof that [Mr. Richie] is not alone in believing that he would be damaged if the marks were registered." *Id.* Habanos' fear of damage is more reasonable than Mr. Richie's. Given the global economy, it seems fairly obvious that Habanos' mark is more valuable if no one owns the GUANTANAMRA mark in the U.S., even if Habanos does not. Accordingly, Habanos has standing because it has a real interest in the registration and it has a reasonable basis for its belief of damage.

   *D. The TTAB improperly denied registration of GUANTANAMERA.*

The TTAB improperly denied registration of GUANTANAMERA for cigars because it used an incorrect legal standard. The TTAB must deny registration of marks "which when used on or in connection with the goods of the applicant is primarily geographically deceptively misdescriptive of them." 15 U.S.C. § 1052 (e)(3). A mark is "primarily geographically deceptively misdescriptive" when:

   (1) the primary significance of the mark is a generally known geographic location, (2) the consuming public is likely to believe the place identified by the mark indicates the origin of the goods bearing the mark, when in fact the goods do not come from that place, and (3) the misrepresentation was a material factor in the consumer's decision.

*In re California Innovations, Inc.*, 329 F.3d 1334, 1341 (Fed. Cir. 2003). The TTAB cited the proper legal standard, but erred in its application of the third part. The Court reviews the three parts of the test—geographic location, goods-place association, and materiality—as applied by the TTAB.

### a. Geographic Location

There is significant evidence in the record to find that Cuba or Guantanamo, Cuba is the primary significance of GUANTANAMERA. The primary significance of a mark is a finding of fact. *See In re Wada*, 194 F.3d 1297, 1300 (Fed. Cir. 1999). Guantanamera literally means "girl from Guantanamo." The Plaintiff argues that the primary meaning of GUANTANAMERA is the famous Cuban song by Joseito Fernandez. The TTAB recognized that the folk song's history reinforces the geographic connection to Guantanamo and Cuba. (Op. U.S.P.T.O. at 14.) Based on the deferential standard of review, the Court finds that the Plaintiff produced insufficient evidence to disturb the TTAB's factual finding that GUANTANAMERA's primary significance is a geographic location.

### b. Goods-Place Association

There is sufficient evidence to find that the consuming public is likely to believe that the Plaintiff's cigars originate from Cuba. If consumers are likely to believe that the place identified on the mark is the origin of the goods, when in fact the goods do not come from that place, the element is satisfied. *California Innovations*, 329 F.3d at 1341; *see also In re Spirits International N.V.*, 563 F.3d 1347, 1350–51 (Fed. Cir. 2009) (leaving the TTAB's analysis of the goods-place association unaltered when the TTAB found that Moscow was well known for vodka). The Federal Circuit characterized this element as a "relatively easy burden of showing a naked goods-place association." *California Innovations*, 329 F.3d at 1340.

The plaintiff argues that GUANTANAMERA fails the goods-place association test because Guantanamo is not known for the cigars. In support of this argument, the Plaintiff cited a quotation from *Spirits* that neither opposing counsel nor this Court could locate. (*See* P. Mot. Summ. J. 25.) The record contains ample evidence that cigar tobacco is produced in the Guantanamo province. (TTAB Op. 18–20.) There is also ample evidence to support the finding that Cuba is well-known for cigars. *Id.*

Beyond the evidence that Guantanamo produces cigars, the plaintiff insists the goods-place association element is not satisfied because the place named in the mark is not known for producing the product. (*See* Pl.'s Mot. Summ. J. 25–20.) The Court finds this argument unpersuasive because there is sufficient evidence in the record to support a finding that Guantanamo is known for producing cigar tobacco. The TTAB did not err in finding that the goods-place association was met.

   *c.  Materiality*

The TTAB erred as a matter of law in its analysis of materiality. To establish a *prima facie* case, the TTAB or the opposition must show that "a significant portion of the relevant consumers would be materially influenced in the decision to purchase the product or service by the geographic meaning of the mark." *Spirits*, 563 F.3d at 1357. Accordingly, the Court holds that Habanos never established a *prima facie* case for the third part of the test before the TTAB.

In *Spirits*, the TTAB refused to register the mark MOSKOVSKAYA for vodka because it was primarily geographically deceptively misdescriptive. *Id.* at 1350. MOSKOVSKAYA literally means "of or from Moscow," but the registrant admitted that the vodka is not manufactured, produced, or sold in Moscow and has no connection to Moscow. *Id.* The TTAB found that the primary significance of the mark was a generally known geographic location and

recognized that Moscow is renowned for vodka. *Id.* Thus, the first two elements of the test were satisfied. *Id.* The Court took issue with the TTAB's application of the third element, the materiality requirement. *Id.* at 1350–51.

The TTAB reasoned that because 706,000 people in the United States speak Russian, and because 706,000 is "an appreciable number," the materiality requirement was satisfied. *Id.* at 1351. The Court remanded the case without ruling on the merits because the TTAB failed to consider whether Russia speakers were a "substantial portion" of the intended audience. *Id.* at 1357. The Court noted that only 0.25% of the U.S. population speaks Russian. *Id.* To satisfy the materiality requirement, a substantial portion of relevant consumers must be likely to be deceived, not an absolute number or particular segment (such as foreign language speakers). *Id.* at 1353.

Here, the TTAB erred as a matter of law in applying the materiality requirement. The TTAB decided this case before the Federal Circuit decided *Spirits*. The portion of the TTAB's opinion that addressed the materiality factor was only four sentences and did not make any findings regarding a "substantial proportion" of materially deceived consumers. The TTAB stated two reasons why the misrepresentation is material in the minds of consumers: (1) Cuba's "renown and reputation for high quality cigars" and (2) the plaintiff's subjective intent to deceive customers evidenced by previously placing "Guantanamera, Cuba" and "Genuine Cuban Tobacco" on the packaging.

*Spirits* plainly demands more than a finding of Cuba's reputation for high quality cigars. In *Spirits*, Moscow's renown reputation for vodka was not enough to affirm the TTAB's legal conclusion; likewise, Cuba's renown reputation for cigars is not enough in this case.

The Court finds the plaintiff's false claims on the packaging equally inadequate to satisfy *Spirits*. First, the registrant's subjective intent provides little, if any, insight into the minds of consumers. Consumers could have numerous reasons as to why they purchase Guantanamera cigars, but without any objective findings, it is difficult to make an accurate conclusion as to whether the geographic misdescription will materially affect a "substantial portion" of consumers. Second, the Court does not consider extraneous and out-dated marketing material particularly relevant in determining a mark's ability to satisfy the §1052(e)(3) registration bar. The Lanham Act bars registration of *marks* that are primarily geographically deceptively misdescriptive, not marks that are accompanied by deceptive packaging material. *See* 15 U.S.C. § 1052.

Habanos attempts to distinguish *Spirits* by asserting that this case meets the "substantial proportion" requirement. (D. Mot. Sum. J. 42.) It argues that there are millions of Spanish speakers in the U.S., that the English speaking public recognizes "guantanamera" to mean Guantanamo, Cuba, and that GCC targeted Spanish speaking consumers. (*Id.* at 42–44.) Nevertheless, this evidence fails to determine that a substantial proportion of the target audience would be deceived into purchasing the cigars *because of* the false goods-place association. Habanos never introduced evidence that suggested material deception of a substantial proportion of the relevant consuming public.

*E. Civil Contempt and Sanctions*

The Court will issue a show cause order giving the plaintiff ten (10) days to explain why it has not complied with the August 18, 2009 Court Order. The Court has both an inherent and a statutory power to use civil contempt to enforce its orders. *Shillitani v. U.S.*, 384, U.S. 364, 370 (1966); 18 U.S.C. § 401. Courts properly exercise civil contempt power to coerce compliance

with a court order or to compensate a complainant for losses sustained." *In re Fannie Mae Securities Litigation*, 552 F.3d 814, 823 (D.C.Cir. 2009)).

The defendant suggests dismissal and additional sanctions to coerce the plaintiff's compliance with the Aug. 10, 2009, order. The plaintiff claims its President, Jose Montagne, is attempting to secure a loan to cover the outstanding balance on the original sanctions. However, the Court is concerned that the plaintiff—the architect of the payment plan—has not made one progress payment to date. Therefore, a show cause order is appropriate. The Court will retain jurisdiction over the civil contempt and sanctions issues and file a separate order.

### F. Expert Fees

The parties assert vastly different figures for the amount due to Mr. Armenteros. The plaintiff insists the entire invoice ($11,661.69) is due, while the defendant argues $266.64 is appropriate. Mr. Armenteros is entitled to payment, but not in the amount that either party suggests. Under the Federal Rules, "the court must require the party seeking discovery to pay the expert a reasonable fee for time spent in responding to discovery . . . ." FED. R. CIV. P. 26(b)(4)(C). The parties and the Court could only locate one case in this jurisdiction on point, *U.S. ex rel Fago v. M & T Mortgage Corp.*, 238 F.R.D. 3, 14–15 (D.D.C. 2006).

In *Fago*, the Court held that preparation time before a deposition was not included in the scope of Rule 26(b)(4)(C). 238 F.R.D. at 15. Recognizing a case-by-case analysis rather than a general rule, the Court mentioned circumstances when preparation time might be included, such as "where the expert has to testify about particularly complex issues or where there has been a lapse of time between the completion of the expert's report and the expert's deposition." *Id.*

The Court finds the *Fago* case persuasive and will not include the preparation time in the Mr. Armenteros' fee. Nearly all the preparation time was for printing documents that Rule

26(a)(2)(B) required the expert to produce, regardless of the defendant's discovery request. Thus, the defendant will not have to pay for Mr. Armenteros' time when the Federal Rules required his production of the data.

The defendant also objects to Mr. Armenteros' hourly rate, which the defendant claims is unreasonably high at $350 an hour. There is limited case law in our circuit, but many District Courts agree that the party seeking reimbursement for a witness fee bears the burden of establishing reasonableness. *Mannario v. U.S.*, 218 F.R.D. 372, 374 (E.D.N.Y. 2003); *New York v. Solvent Chemical Co.*, 210 F.R.D. 462, 468 (W.D.N.Y. 2002); Royal Maccabees Life Ins. Co. v. Malachinski, No. 96 C 6135, 2001 WL 290308, at *18 (N.D.Ill. March 20, 2001). The Court may determine a reasonable fee when the parties present insufficient evidence of reasonableness. *Id.* To determine the reasonableness of an expert's fee, courts weight the following factors:

> (1) the witness's area of expertise; (2) the education and training that are required to provide the expert insight that is sought; (3) the prevailing rates for other comparably respected available experts; (4) the nature, quality, and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; (6) the fee actually being charged by the expert to the party who retained him; and (7) fees traditionally charged by the expert on related matters.

*Mannario*, 218 F.R.D. at 374.

In the case at bar, the Court will deny plaintiff's motion to compel expert fees without prejudice because the Court needs additional information to determine reasonableness. The parties' inability to agree on an hourly rate *before* the deposition is baffling. Regardless, both parties' analyses of a reasonable rate were insufficient.

When addressing factors one and two, the plaintiff focused solely on Mr. Armenteros' credentials, rather than *why* his credentials merited his quoted hourly rate. Similarly, the plaintiff's analysis of the third factor generally discussed the rates of other experts, yet never addressed any "comparably respected available experts," except to say that Mr. Armenteros'

expertise is "unique." Expert witnesses possess unique knowledge; the market for experts who possess that unique knowledge should be the focus analysis of the third factor. The Court would like to know the rates of other experts in the cigar market or a related market who have given deposition testimony based on their experience. Though the plaintiff did not carry its burden of establishing reasonableness, the defendant's suggested hourly rate of $33 is just as unreasonable.

The defendant's reasoning is as follows: the plaintiff paid the expert $1,500[1] to prepare the report; preparing the report took 45 hours; therefore, the expert's hourly rate is $33.33 per hour. The defendant's reasoning is flawed. It assumes that preparing a written report and giving deposition testimony are similar services. The Court does not agree. Preparing a written document on an essentially self-determined schedule is distinct from answering questions in an adversarial setting in a specific place, date, and time. The expert is free to charge different rates for different services. Computing an hourly rate for one service based on a flat fee for a different service is not reasonable.

Thus, the plaintiff's motion to compel expert fees is denied without prejudice. The Court will hear motions on the reasonable rate issue and directs the parties to focus their arguments on the first three factors. The remaining four factors are sufficiently briefed.

*G. Attorney Fees*

The plaintiff requested attorney fees associated with the compulsion of the expert fees. The Court denies that request at this time.

---

[1] The contract is for $3,000; $1,500 was the amount paid to the expert when the defendant drafted that motion. (Pl.'s Reply Mot. Compel Expert Fees.) Presently, the plaintiff paid the expert $2,000 for preparation of the report. (*Id.*) If the Court were going to determine the expert's hourly fee based on a flat fee contract, it would use the contract price, not the amount paid.

### III.    CONCLUSION

Therefore, this case is remanded to the TTAB so it may apply the proper legal standard to the third part of the test for primarily geographically deceptively misdescriptive terms. A signed order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on August 5, 2010.